The Central Railroad Company *vs.* The Atlantic, etc., Company.

THE CENTRAL RAILROAD AND BANKING COMPANY, plaintiff in error, *vs.* THE ATLANTIC AND GULF RAILROAD COMPANY, defendant in error.

1. Assuming that the Confederate government could, for the purpose of carrying on war against the United States, divest the plaintiff of his property by seizure—which is not made a question here—and assuming that the Court was in error as to the necessity of an Act of Congress to authorize an impressment, and that it was absolutely necessary that full compensation should be made, so as to protect the title in an innocent holder, yet, under the facts of this case, as they stand without question on the record, the plaintiff was entitled to a verdict. The defendant was fully informed of the instructions of the agent, that the iron was to be shipped to Atlanta to be rolled into plating for ships, and before the iron was in fact taken out of the possession of the plaintiff, contracted with the agent that when taken, the iron, instead of going forward to Atlanta, should be turned over to it. This contract was illegal outside of the instructions of the agent, and this was in the knowledge of the defendant, so that the actual seizure was in fact for the use of the defendant, and not for the Confederate States. The defendant is not an innocent holder, but is in complicity with the agent in his possession of the iron, and that under a contract entered into before the iron left the possession and custody of the plaintiff. In this view of the case the errors of the Judge, if they were errors, are immaterial, as the verdict must have been for the plaintiff.

2. It was not error in the Court to refuse to charge the jury that they might take into account the injury to the defendant's iron by General Sherman, and to charge that if they found for the plaintiff they might find the highest proven value of the iron up to the time of the trial.

3. The verdict of the jury was illegal in finding the highest proven value and any interest for the plaintiff. The measure of damages under our law is, as was charged by the Court, and it is not in the power of the jury to find a verdict for such damages, with interest from any date. Unless the plaintiff will remit this verdict for interest, there must be a new trial.

Confederate States. Impressment. Constitutional law. Trover. Damages. Interest. Verdict. Before Judge SCHLEY. Chatham Superior Court. May Term, 1872.

For the facts of this case, see the opinion.

JACKSON, LAWTON & BASINGER, for plaintiff in error.

LAW, LOVELL & FALLIGANT, for defendant.

The Central Railroad Company *vs.* The Atlantic, etc., Company.

McCay, Judge.

A brief statement of the facts of this case is as follows: In March, 1862, Mr. James G. Miner was ordered by Mr. Mallary, the Confederate Secretary of War, to proceed to Atlanta, Georgia, and make arrangements with a rolling mill there to roll, pierce, etc., iron plates for plating vessels of war. He was also ordered to secure all the old rail or other iron *in the market*, at the lowest price, and send it to Atlanta to be rolled. In April, 1862, he was further instructed by Mr. Mallary, that if he found either old or new iron in private hands, suitable for rolling into sheathing, etc., to purchase it if possible at a fair price, paying for it one-half in Confederate notes and one-half in Confederate bonds. If the offer was declined, he was to notify the parties that the iron was wanted for the naval service, and that he *would be compelled* to take it and pay for it its appraised value. He was to call upon the owner to appoint an appraiser, and he was himself to appoint one, and the two were to fix the price. He was, when this was done, to pay for the iron and seize it. Mr. Miner, finding certain iron in possession of the Atlantic and Gulf Railroad, at various points along its line, offered to buy it; the road declined to sell, and in June, 1862, Miner notified the company, in writing, that he had that day seized and taken possession of the iron for the Confederate States, for the public defense, and that the Government would pay for the same when the weights were ascertained, one-half in bonds, and one-half in Treasury notes. He did not, however, in fact, take possession of the iron, but left it as he found it, in piles along the road. The road refused to transport the iron, protested against the seizure, and applied to the authorities at Richmond to stop it. After the written notice was given, and while the iron was yet unmoved, Miner proposed to the officers of the Central road that if it would furnish him old railroad iron *then* he would give ton for ton of new iron for it when he could get the transportation over the Gulf road. The Central officers refused, unless he should

have the new iron in possession and deliver it. Subsequently, and still before the iron was actually taken away from the Gulf road, it was agreed between Adams, the superintendent of the Central, and Isaac Scott, who, it seems, was entrusted by Miner "with the disposition of the iron," that as the Gulf road iron came on to Savannah, it should be delivered to the Central, and the Central should send on to Macon old iron, ton for ton, paying to Scott $32 00 per ton *bonus*, Mr. Cuyler remarking that it was a pretty sharp thing in Scott, but directing Adams to make the arrangement. In September the Gulf iron was actually taken away from the road, under the direction of the Confederate Quartermaster's Department. Five hundred tons of it were delivered to the Central, the latter furnishing that quantity of old iron, and paying to Scott the $32 00 per ton *bonus*. Miner showed to Adams, at the time he made the proposition for exchange, his instructions. No appraisement was made, and no payment, though the evidence does not show that the officers of the Central knew this. The evidence is clear, however, that they did know that the iron they got was Gulf railroad iron, and that they had made arrangements with Scott to make the exchange and pay the *bonus before* the Gulf iron was *actually taken out of the possession of the Gulf road*, and that they also knew that Miner's instructions did not authorize him to make any such bargain. The iron, thus obtained by the Central road, was soon after laid on its track. In November, 1864, General Sherman tore up much of the track of the Central road, and bent a good deal of its iron, so that it had to be sold as old iron. This action was brought in 1866, by the Gulf road against the Central, in trover, for the iron which went into its possession. Iron was proven to have cost the Gulf road, laid down at the point where this was taken, $98 11 per ton, in 1867. The jury found for the plaintiff for the highest price proven of iron, to-wit: the price paid by the Gulf road in 1867, with interest from the 23d September, 1865.

We do not feel called on to discuss or decide several of the

The Central Railroad Company *vs.* The Atlantic, etc., Company.

questions made at the trial, and very ably and elaborately argued by counsel at the hearing before this Court.

1. In the view we take of the issue between the parties, as established by the proof, we are of the opinion that the verdict, except for the interest, is right, whether his Honor Judge Schley ruled correctly as to the powers of the Confederate States officers under its Constitution and laws, to seize property under the circumstances, or not. Assuming that the Confederate States' Secretary of War might lawfully divest a title by seizure, that no Act of Congress was necessary, that a great exigency existed, and that under the circumstances even payment was excused, or that an innocent third person, setting up title through the Confederate States, was protected unless actual notice of non-payment was shown. Assuming all this—which we do not decide—we are of the opinion that, under the facts proven, the Central road is liable to the Gulf road for this iron. Mr. Adams knew Miner's instructions to seize and forward the iron to Atlanta. Before the iron was actually seized, indeed whilst it was an open question and under discussion between the Gulf road and the authorities at Richmond, whether it should be taken away at all, the contract was made with Scott that when the iron was taken it should go forthwith into the possession of the Central road.

In the very nature of things, an impressment can only be by *taking possession.* We will not say that if an officer be about to take possession, and have the present capacity to do so, and the owner acquiesces, he may not afterwards be treated as the bailee of the public. But surely a mere notice of seizure, with a protest and objection by the owner, as was the case here, is no seizure. The evidence is clear that nothing was done by Miner, but to give the written notice, and even this stated that payment would be made after the weight was ascertained. The iron remained as it was, along the line of the road, in possession of the owner, not even under guard, the company refusing transportation for it and objecting to the impressment. As we have said, the very essence of an impressment of personal property is taking possession. It is

thus goods are seized under the revenue laws; it is thus a
sheriff seizes; it is thus a landlord distrains. It would be
monstrous to say that a citizen could be divested *of his title* in
personal property under any form of government by notice
that the public had seized it. Doubtless, Mr. Miner had some
enlarged idea of his powers, and supposed that it was compe-
tent for him to set down in his office in Savannah and by the
magic of his pen seize the one thousand tons of iron scattered
along the line of the Atlantic and Gulf road. But if he
could do this (by the practice of *any* government) his five
thousand tons of iron could easily have been got; at least, he
could easily get *title* to it, for by this simple process the iron
of everybody in the State was as easily taken as the iron of
the Gulf road. But both Mr. Adams and Mr. Cuyler knew this
would not do, and they refused to give even old iron for new
until the new was in Miner's possession. But they *made the
bargain* with Scott, and when this Gulf iron was, in fact,
taken—impressed, seized—from the Gulf road, it was taken,
not to be sent to Atlanta to be rolled, not to be used for the
plating of war vessels for the Confederacy, but to be turned
over to the Central Railroad, in pursuance of a contract made
by Scott with Adams. And this the Central officers knew;
indeed, by the bargain, as stated by Adams, the Gulf iron
was to be delivered at Savannah, as it came forward, and the
Central to send on the old iron and pay the money. There is
nothing in Miner's instructions to justify this bargain, and
these instructions were shown to Mr. Adams. The true state
of the matter, therefore, is, that this iron was *taken to be turned
over to the Central road,* and this with the full knowledge of
Mr. Cuyler and Mr. Adams, they to pay to Scott $32 00 per
ton for the benefit their road got in the transaction. The
right of eminent domain has never been held to go this far.

To justify taking private property for public use, the taking
must be at least with intent to so apply it. To take it for the
purpose of exchanging it with another citizen for his property,
is a perversion of the right. Such an act does not come within
the scope of the right of eminent domain. The Central iron

was as subject to seizure as the Gulf iron, and to take the Gulf iron and exchange it for the Central iron was an act of favoritism and not at all a seizure for public uses.   And this was by agreement with the Central before the taking was completed.   The perversion of the iron from its true use was part of the purpose of the taking; it was a vice that entered into the impressment itself, and would have vitiated it had every form prescribed by law in times of peace been complied with.   And of this purpose the Central road was fully aware. It contracted with Scott with the full knowledge that the iron was to be traded to it instead of going forward to Atlanta to be used by the Confederate States for plating ships.

The right to take private property for public use is not thus to be perverted for private purposes.   Such a taking is utterly void, though every form be complied with, and the full value paid to the owner:   See Cooley's Constitutional Limitations, 540, and other cases there cited.

It was contended in the argument that this exchange to the Central road of new iron for old, was itself for public use; that the Central road was part of the great line from the west to the seaboard and to Richmond, and that it was the public policy of the Confederate States to keep this important line in good condition, even if in doing so other roads of less importance were to be the sufferers.   But this is an after-thought.   Mr. Miner and Isaac Scott were charged with no such mission, even if such a purpose would justify impress-ing iron.   The receipt of the $32 00 per ton by Scott's "smart trick" as it was, gives, we fear, the true character to the transaction.   We fear the true purpose was to get the money; and that not even an intent to benefit the public was indulged in.   At any rate the iron was taken from the Gulf road, to be hauled to the Central for old iron and money, and this the Central knew and participated in, and if this seizure was void the Central road got the iron with full no-tice of this illegal purpose, and can stand in no better situa-tion than Miner or Scott.   Under the authorities we have quoted, had every requisite of the law in time of peace been

complied with; had there been an Act of Congress to author-
ize the taking; had appraisers been duly appointed, and gold
paid to the full value of the property, the turning of the iron
over to the Central road, would render the taking illegal
and as the Central well knew that it was getting pressed iron
of the Gulf road for its old iron $32 00 per ton *bonus,* it
stands charged with full knowledge of the illegality. It is
in no better position than those who conceived the plan and
carried it to completion, of seizing the Gulf iron for the Cen-
tral road, sending forward the Central iron to Atlanta for the
use of the Confederacy, and pocketing the $32 00 per ton the
Central paid for the advantage it got in the transaction.

For these reasons we think the jury was right in finding
for the plaintiff, even admitting the Judge in error on the
other points made. We do not discuss these points because
we think it unnecessary, as the case will not, as we believe,
be again tried. The view we have taken affirms the verdict
of the jury and settles the liability of the Central road for
the iron.

2. There was no error in the refusal of the Judge to charge
that the jury might consider the injury to the defendant's iron
by the Federal troops under General Sherman. The plaintiff
had no part in that except as a common sufferer. The evi-
dence fails to show that any of the iron now sued for was in-
cluded in the bent and destroyed bars, and we do not know
of any rule that would allow this to be considered if it did.

3. We are clear, however, that the verdict giving interest
on the amount found from 23d of September, 1865, is illegal
under our law. This is not an action for the price of the iron,
waiving the *tort.* The measure of damages then would be
the value of the iron at the time it was taken, with interest.

In this kind of action the verdict is for damages, a gross
sum, and by our statute, Code of 1873, section 3077, the
plaintiff may recover the highest proven value of the thing
up to the time of the trial. This Court, in 37 *Georgia,* 335,
decided that this is now the only rule. Perhaps this is too
broad a statement, as cases may occur, as, for instance, where

the property has merely passed through the defendant's hands, where the sounder rule would, as I think, be to give the value at the conversion, with interest since, not as interest but as the measure of damages.

Judgment reversed, conditionally.